UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LELIA JONES,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )    No.  4:05CV751 FRB
                                      )
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

**<u>MEMORANDUM AND ORDER</u>**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On September 23, 2002, plaintiff Lelia Jones filed an
application for Disability Insurance Benefits pursuant to Title II,
42 U.S.C. §§ 401, <u>et</u> <u>seq.</u>, and an application for Supplemental
Security Income pursuant to Title XVI of the Social Security Act,
42 U.S.C. §§ 1381, <u>et</u> <u>seq.</u>, in which plaintiff alleged that she
became disabled on October 26, 2001.  (Tr. 37-39, 213-15.)  On
initial consideration, the Social Security Administra-tion denied
plaintiff's claims for benefits.  (Tr. 29-35, 216-21.)  On April
29, 2004, a hearing was held before an Administrative Law Judge
(ALJ).  (Tr. 253-68.)  Plaintiff testified and was represented by

counsel. On June 24, 2004, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 11-21.) On April 18, 2005, after consideration of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 4-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the hearing on April 29, 2004, plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff is forty years of age. Plaintiff stands five-feet, five-inches tall and weighs 208 pounds. Plaintiff is not married. Plaintiff lives with her two children, ages thirteen and ten. (Tr. 256.) Plaintiff completed high school and participated in vocational training, earning a certificate in typing. (Tr. 257.) Plaintiff testified that she received a Workmen's Compensation settlement and currently receives assistance from Aid to Families with Dependent Children. (Tr. 267.) Plaintiff also received unemployment compensation in the second and third quarters of 2002. (Tr. 63.)

From August 1991 to October 1993, plaintiff worked as a housekeeper at a hospital. (Tr. 78.) From October 1993 to March 1996, plaintiff worked as an obstetric technician at Deaconess Hospital. (Tr. 78, 257.) From August 1996 to March 1998, plaintiff worked as a housekeeper at Missouri Baptist Hospital. From October 1998 to January 2001, plaintiff worked as a

housekeeping and laundry supervisor at Wellbridge, a health club. (Tr. 78, 258.) From May to October 2001, plaintiff worked as a housekeeping supervisor for janitorial services. (Tr. 78.) Plaintiff testified that repetitive use of her wrists and hands caused her to sustain injury while working at Wellbridge and that such injuries worsened during her subsequent employment, thus causing her to stop working in October 2001. Plaintiff testified that she has felt incapable of working since that time. (Tr. 259.)

Plaintiff testified that her hand, wrist and arm conditions have worsened since she last worked. Plaintiff testified that, during the day, she wears braces for stability and pain management. Plaintiff testified that she wears splints at night when she sleeps. (Tr. 260.)

Plaintiff testified that she has undergone extensive diagnostic testing for her condition, including MRI's and EMG's, and that such testing has shown her to suffer tendinitis and reflex sympathetic dystrophy, and carpal tunnel in her right arm. (Tr. 261.) Plaintiff testified that her physician considered surgery but determined that plaintiff would obtain no relief therefrom. Plaintiff testified that she participated in physical therapy on three occasions from which she obtained no relief. (Tr. 261-62.) Plaintiff testified that her physicians are treating her for pain management inasmuch as nothing else can be done for her condition. (Tr. 262.)

Plaintiff testified that her physicians have instructed her not to lift heavy items because she has lost strength in her arms. Plaintiff testified that she has been instructed not to do dishes or laundry inasmuch as such activities bring on additional and severe pain. (Tr. 262-63.) Plaintiff testified that she recently carried a gallon of milk which caused her to experience severe stabbing pain from her fingers up through her arm. Plaintiff testified that her fingers became swollen as a result and that the pain lasted approximately three days. (Tr. 263.) Plaintiff testified that the heaviest thing she can now lift is an empty plastic cup. (Tr. 264.)

Plaintiff testified that she has difficulty with buttons and zippers inasmuch as she experiences severe pain in her fingers and wrists when manipulating them. Plaintiff testified that she would experience constant pain if she were to attempt to cut a thick steak with a knife and fork. Plaintiff testified that she experiences pain from her fingers to her shoulders. (Tr. 264.) Plaintiff testified that she drives approximately three times a month but experiences pain when she does so. Plaintiff testified that she does not go alone when she grocery shops and that her fiancé mostly removes the items from the shelves and places them in the cart. (Tr. 265.) Plaintiff testified that she does no housework and that her fiancé does the work. Plaintiff testified that she does minimal cooking. Plaintiff testified that she spends

her days "[j]ust basically sitting at home trying to deal with the pain." Plaintiff testified that she has difficulty sleeping because of the pain and the stiff splints she wears. (Tr. 266.)

### III. Medical Records[1]

Plaintiff visited Dr. Philip G. George on November 5, 1999, and complained of swelling and pain in the right forearm which she experiences when she grips, squeezes, pushes, pulls, or twists with her right hand. Plaintiff reported having these symptoms since March 1999, that she had participated in physical therapy and taken medication, but that she continues to be bothered by the condition. Physical examination showed full range of motion at the right shoulder, elbow, wrist, and fingers. No soft tissue swelling or deformity was noted about the right forearm. No increased skin temperature or evidence of active inflammation was noted. Dr. George noted there to be diffuse tenderness to palpation over the dorsal aspect of the distal third of the forearm. Plaintiff complained of discomfort with flexion and extension of the wrist and fingers, but no localized crepitus was noted. (Tr. 125.) Dr. George diagnosed plaintiff with tendinitis

---

[1]Records were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision. (Tr. 222-52.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

of the right wrist and distal forearm and determined to proceed with conservative care. Plaintiff was prescribed Naproxen[2] and was instructed to return for follow up in three weeks. (Tr. 126.)

Follow up examination with Dr. George on November 23, 1999, showed plaintiff to have slight soft tissue swelling of the right forearm and wrist. The wrist itself demonstrated no limitation of motion but plaintiff complained of pain with full pronation and supination. Dr. George instructed plaintiff to discontinue Naproxen, and Celebrex[3] was prescribed. Plaintiff was instructed to return for follow up in one month. (Tr. 127.)

On January 3, 2000, plaintiff reported to Dr. George that she was slowly improving and that she felt she obtained more benefit from ibuprofen than from Celebrex. Plaintiff complained of continued swelling and pain with her work. Physical examination showed no obvious tissue swelling. With palpation, "[v]ery slight rather diffuse" tenderness was noted about the distal third of the forearm and wrist. Plaintiff had full active range of motion of the forearm, wrist and all joints of the right hand. Dr. George instructed plaintiff to discontinue Celebrex, and ibuprofen was prescribed. Plaintiff was instructed to return in four weeks.

---

[2]Naprosyn (Naproxen) is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. <u>Physicians' Desk Reference</u> 2744-45 (55th ed. 2001).

[3]Celebrex is indicated for signs and symptoms of osteoarthritis and rheumatoid arthritis. <u>Physicians' Desk Reference</u> 2986 (55th ed. 2001).

(Tr. 128.)

Plaintiff returned to Dr. George on January 31, 2000, who noted there to be swelling along the volar aspect of the left distal forearm. Some tenderness was noted about the volar aspect of both forearms. Dr. George opined that plaintiff continued to exhibit signs and symptoms of flexor and extensor tenosynovitis bilaterally of the forearms and wrists. Dr. George instructed plaintiff to continue with ibuprofen and to discontinue laundry and mopping at work for one month. (Tr. 130.)

On February 28, 2000, plaintiff complained to Dr. George that she continued to experience pain in her wrists, arms and elbows and that she was now experiencing pain in her left shoulder. Examination showed full active range of motion of all joints of the upper extremities. Some slight soft tissue swelling was noted about the left lateral epicondyle and the dorsum of the left forearm. No crepitus was palpated at the wrist, forearm or elbow level on either side. Dr. George found plaintiff's upper extremities to be neurologically intact. Dr. George noted plaintiff to continue to manifest what appeared to be diffuse tendinitis. He instructed that plaintiff continue with anti-inflammatory medication and light duty work and to return for follow up in one month. (Tr. 131.)

Plaintiff returned to Dr. George on March 27, 2000, and reported that her symptoms were essentially unchanged. Physical

examination was unremarkable. Dr. George opined that plaintiff could work as long as she did not engage in any laundering, sweeping and mopping. Plaintiff was instructed to take ibuprofen and to use ice packs for any observable swelling. Plaintiff was instructed to return in two months. (Tr. 132.)

On May 19, 2000, plaintiff reported to Dr. George that her condition remained unchanged, but that she had experienced worsened swelling on the left in relation to the work she performed. Physical examination showed only slight volar swelling about the left distal forearm. The remainder of the examination was unremarkable. Dr. George concluded that "[t]his woman is on a clinical plateau. She is working with restrictions and may continue to do so. She is benefitting from Ibuprofen, and I refilled her prescription for that medication[.]" Dr. George instructed plaintiff to return for follow up as necessary. No specific return appointment was scheduled. (Tr. 133.)

Plaintiff visited Dr. George on June 26, 2000, and complained of pain in her right wrist and forearm area. Dr. George noted plaintiff to have positive Finkelstein's test as well as tenderness to palpation over the first dorsal compartment and the muscle belly of the abductor pollicis longus. The remainder of the examination was unremarkable. Dr. George suggested that plaintiff be administered a steroid injection, which plaintiff adamantly refused. Dr. George instructed plaintiff to continue with

ibuprofen and to apply ice for observable swelling. Plaintiff was further instructed to continue to work with the previously noted restrictions and to follow up in six weeks. (Tr. 134.)

Plaintiff returned to Dr. George on July 28, 2000, and complained of increased swelling and aching in both forearms due to increased demands at work. Physical examination showed no obvious swelling and no objective evidence of active inflammation or musculoskeletal injury. Plaintiff had full range of motion of both elbows, wrists and all joints of both hands. No crepitus was noted about any of the joints. Plaintiff could fully extend all fingers and was able to make good, tight fists bilaterally. Dr. George concluded:

> This woman's symptoms are fair [sic] in excess of her physical findings. I did agree to restrict her work activities. I do think it would be helpful if she did not have to do laundry. She asked for restrictions on sweeping, mopping and vacuuming. I agreed to offer such restrictions for a four-week period. I advised her to continue her medication and basically told her to expect to have her restrictions diminished in the very near future.

(Tr. 135.)

On August 31, 2000, plaintiff returned to Dr. George and reported her condition to improve in that she had less swelling and less pain. Plaintiff reported that she was no longer performing housekeeping work but instead did nothing but office work.

Examination showed no evidence of abnormality. Dr. George suggested another month of restricted duty and opined that plaintiff could then be released to return to normal activities. (Tr. 136.)

On September 28, 2000, plaintiff reported to Dr. George that the swelling had increased in her left forearm due to recent cold weather. Dr. George noted plaintiff to be wearing an Ace bandage on her left forearm. Upon removal of the bandage, Dr. George observed there to be no swelling. Grip strength was noted to be slightly diminished on the left, but Dr. George noted this to be uneven on repeated tests. The remainder of the examination was unremarkable. Dr. George suggested that plaintiff continue with ibuprofen and restricted duty. Dr. George instructed plaintiff to return for follow up as necessary. No specific return appointment was scheduled. (Tr. 137.)

Plaintiff visited Dr. George on January 3, 2001, and reported her left arm symptoms to remain unchanged. Dr. George noted the physical findings to be negligible, specifically noting there to be no soft tissue swelling. Plaintiff had normal motion of the left elbow, wrists and all joints of the left hand, without palpable crepitus. Dr. George refilled plaintiff's prescription for ibuprofen and instructed plaintiff to continue with the previously imposed work restrictions. (Tr. 138.)

On February 28, 2001, plaintiff continued to complain to

Dr. George of pain and swelling in her left forearm, but reported that her symptoms were fairly well-controlled with ibuprofen. Physical examination was unremarkable. Dr. George informed plaintiff that he was unable to document any specific objective abnormalities in her upper extremities. Dr. George opined that it was safe for plaintiff to work without functional restrictions and suggested that plaintiff work at the highest capacity that she is able. Dr. George noted plaintiff's recent prescription for ibuprofen to be sufficient to take care of her for several months. Dr. George instructed plaintiff to call him if she needed further medication. No follow up appointment was scheduled. (Tr. 139.)

In a letter dated April 2, 2001, to Kent Krimmel of Martin Boyer Company, Dr. George stated, "I do think that no further treatment is necessary for Ms. Jones as of this date. I feel that she presently has reached maximum medical improvement. No returned appointments have been scheduled in this office." (Tr. 140.)

Plaintiff visited Dr. Anthony E. Sudekum on April 16, 2001, for evaluation of her upper extremity pain. Plaintiff reported that she experienced nocturnal tingling, as well as pain and swelling. (Tr. 145.) Dr. Sudekum noted plaintiff's relevant medical history and plaintiff reported that her symptoms had not changed significantly since her job was eliminated on January 12, 2001. Physical examination showed no swelling or muscle atrophy of

either upper extremity. No edema was noted. Plaintiff had full, normal active and passive range of motion bilaterally of the shoulders, elbows, forearms, wrists, and fingers. Generalized subjective tenderness was noted about both forearms. (Tr. 147.) X-rays of both forearms, wrists and hands revealed no evidence of fracture or bony abnormality. Dr. Sudekum noted there to be no objective evidence of any ongoing abnormality of either upper extremity. Dr. Sudekum noted that if plaintiff's condition were indeed chronic forearm tendinitis, such condition would have resolved with the treatment already rendered. Dr. Sudekum further noted plaintiff's symptoms not to be consistent with carpal tunnel but suggested that plaintiff nevertheless undergo a nerve conduction study so that such condition may be objectively evaluated. (Tr. 148.) Dr. Sudekum released plaintiff to full unrestricted duty effective that same date. (Tr. 142, 148.) Also on that same date, Dr. Sudekum prescribed Vioxx[4] for plaintiff and further prescribed physical therapy for her bilateral wrist and arm pain. (Tr. 143, 144.)

In a letter dated June 4, 2001, to Christine Sutton of Cambridge Integrated Services, Dr. George stated, "In my opinion, Lelia Jones has sustained no permanent partial physical disability from any trauma sustained to her left forearm while employed at

---

[4]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain. Physicians' Desk Reference 2049-50 (55th ed. 2001).

Wellbridge." (Tr. 141.)

Plaintiff visited SLUCare on February 5, 2002, for the purpose of establishing a primary care physician. Plaintiff reported that she had had tendinitis for three years following a work injury. Plaintiff complained that she had pain in both hands, both arms, and in her neck when she moves around. Plaintiff reported that she sometimes experiences swelling. Plaintiff reported that cold aggravates her condition, but that she obtains some relief with ibuprofen or Vioxx. Plaintiff reported that Celebrex does not help her condition. Plaintiff reported that she cannot carry anything heavy and that she experiences pain when she writes or types. Plaintiff also reported that she obtained no relief with physical therapy. Physical examination showed plaintiff's wrists to have full range of motion, with crepitation noted on the left and pain with dorsiflexion. Dr. Nora L. Porter noted no other joint pain, tenderness, warmth, or swelling. (Tr. 103.) Plaintiff's muscle strength was measured to be 5/5 with normal tone. (Tr. 108.) Dr. Porter questioned the etiology of plaintiff's pain. Dr. Ported instructed plaintiff to continue with Vioxx and to take acetaminophen for breakthrough pain. Plaintiff was referred to a hand orthopedist. (Tr. 103, 109.)

Plaintiff returned to SLUCare on September 3, 2002, for follow up of her tendinitis. Plaintiff complained that her condition worsened and that she has experienced increasing pain

since March 2002. Plaintiff reported that she has also developed weakness and was dropping things. (Tr. 111, 113.) Plaintiff reported experiencing occasional swelling and warmth of the joints of her right hand, elbow and shoulder. Plaintiff reported that she was not taking Vioxx because of her concerns regarding its side effects and that she was currently taking Tylenol. Plaintiff reported that she had not visited an orthopedist yet because her insurance had expired. Physical examination showed no swelling, warmth or erythema of the right upper extremity. Plaintiff had full range of motion of her hand, fingers, wrist, elbow, and shoulder. Muscle strength was noted to be 5/5 and there was no muscle wasting. (Tr. 111.) Finkelstein's test was positive bilaterally. Tenderness was noted about the cervical trapezius bilaterally. (Tr. 113.) Dr. Porter reviewed x-rays and noted there to be no bony deformity, soft tissue injury or swelling. (Tr. 111.) Dr. Porter continued to question the etiology of plaintiff's symptoms and referred plaintiff to a rheumatologist. (Tr. 112.)

On October 22, 2002, plaintiff visited the St. Louis University Center for Surgery and Rehabilitation and complained of swelling and joint pain from the fingers to the shoulders in both arms. Plaintiff reported the right side to be worse than the left and that she drops objects. Plaintiff reported that her symptoms have worsened since she stopped working. Examination was positive

for wrist pain and swelling. (Tr. 116.) Plaintiff experienced pain in both forearms and shoulders with manipulation. (Tr. 118.) Plaintiff was diagnosed with rheumatoid arthritis and it was determined to rule out myofascial syndrome. (Tr. 119.)

Dr. Rama Bandlamudi of the Division of Rheumatology at St. Louis University Hospital examined plaintiff on November 12, 2002, and noted edema and mild tenderness to both wrists with palpation. Mild tenderness was noted with lifting. It was questioned whether plaintiff had carpal tunnel, spinal stenosis or rheumatoid arthritis. The etiology of plaintiff's symptoms was unclear. X-rays of the wrists and hands were ordered as well as an MRI of the cervical spine. (Tr. 120.)

Plaintiff visited Dr. Bandlamudi again on November 14, 2002. (Tr. 121-22.) Plaintiff complained of having experienced pain and swelling in her hands and arms for three years. Plaintiff reported the pain to be a nagging pain which starts in her fingers and which awakens her at night. Plaintiff reported that she had taken NSAID's and Celebrex with no relief and that she was currently taking Vioxx. It was noted that the MRI of plaintiff's neck was negative. X-rays of plaintiff's arms showed cysts in the right hand. (Tr. 121.) X-rays of plaintiff's left hand and arm were normal. (Tr. 122.) Physical examination showed mild symptoms of Raynaud's disease. Plaintiff had decreased range of motion with notable difficulty in gripping and raising her arms over her head.

(Tr. 121.)  Tenderness was noted about plaintiff's lower neck.  Dr. Bandlamudi diagnosed plaintiff with upper extremity arthralgia and myalgia, and determined to order an x-ray of plaintiff's chest and of her shoulder.  Plaintiff was instructed to return in three to four weeks.  (Tr. 122.)

Plaintiff returned to the Division of Rheumatology on December 6, 2002.  Plaintiff reported that her pain had neither improved nor worsened.  Plaintiff reported that she stopped taking Vioxx and that she had just started Naproxen the previous day. Plaintiff denied any tingling or weakness in her arms.  Plaintiff continued to complain of joint pain and muscle pain.  (Tr. 123.) It was noted that x-rays of plaintiff's chest and shoulders were negative.  (Tr. 123, 152-54.)  Physical examination showed normal sensation and normal deep tendon reflexes of the upper extremities. Muscle strength of plaintiff's upper extremities was measured to be 5/5.  (Tr. 123.)  It was noted that plaintiff left without being seen and then returned with complaints of bilateral shoulder pain. Possible nerve impingement was noted.  It was recommended that plaintiff undergo an open MRI of her spine and shoulders. Plaintiff was instructed to continue with Naproxen and to return in six weeks for follow up.  (Tr. 124.)

In a letter dated December 9, 2002, and addressed to "To Whom It May Concern," Dr. Porter reported that she had been seeing plaintiff since February 2002 regarding the pain in plaintiff's

hands, arms and neck. Dr. Porter reported that she referred plaintiff to a rheumatologist and hand surgeon for further evaluation given her persistent symptoms. (Tr. 170.)

An MRI of plaintiff's shoulders taken December 26, 2002, showed thickening and increased signal of the supraspinatus tendon, which may represent tendinosis or less likely partial tear. Fluid in the subacromial and subdeltoid bursa was also noted, possibly representing bursitis. (Tr. 171-72.)

On December 26, 2002, A. Hickerson, a counselor for disability determinations, completed a checklist Physical Residual Functional Capacity Assessment. (Tr. 160-68.) Upon review of the records of Drs. George and Sudekum, Counselor Hickerson determined that plaintiff had the ability to occasionally lift and carry twenty pounds, and to frequently carry ten pounds. Counselor Hickerson also determined that plaintiff had no limitations in pushing and/or pulling, including operation of hand controls. (Tr. 161.) Counselor Hickerson further determined that plaintiff had no postural, visual, communicative, or environmental limitations. (Tr. 162-64.) Counselor Hickerson determined that plaintiff was limited in her ability to reach and handle with her right upper extremity, but had no limitation in fine manipulation or in feeling. (Tr. 163.)

Plaintiff returned to Dr. Bandlamudi on January 17, 2003. Plaintiff continued to complain of pain, swelling and weakness in

her upper extremity joints and muscles. Plaintiff denied any tingling or numbness. (Tr. 176.) Plaintiff's muscle strength was measured to be 5/5 in all extremities. Joint evaluation showed 1+ tenderness bilaterally in the shoulders, elbows, wrists, and MCP's without swelling. Dr. Bandlamudi diagnosed plaintiff with bilateral shoulder bursitis with possible supraspinatus tendinitis. Plaintiff was offered a cortisone injection for both shoulders, but she refused. Plaintiff was instructed to continue with Naproxen and to participate in physical therapy. Plaintiff was also diagnosed with arthralgia of the hands with no evidence of synovitis. Dr. Bandlamudi noted there to be no current evidence of inflammatory arthritis or connective tissue disease. (Tr. 175.) Plaintiff was instructed to return in two to three months. (Tr. 177.)

Plaintiff visited SLUCare on March 18, 2003, for follow up of her hand weakness and swelling. Plaintiff reported that she was advised by Dr. Woodberry that she had inflammatory arthritis due to increased swelling and warmth in her wrists, but that the rheumatologist informed her that she had no inflammatory process. Plaintiff reported that she stopped participating in physical therapy in February 2003 because both she and her therapist felt it was not providing any benefit and plaintiff complained of increased pain. Plaintiff reported that she takes Naproxen but without obtaining any relief. Dr. Chengappa noted that plaintiff wore

splints on both wrists. Plaintiff reported that she could not hold or write anything due to pain and that her wrists swell at least once every day. (Tr. 178.) Physical examination showed swelling of the wrists bilaterally and decreased range of motion with flexion. Plaintiff had decreased range of motion of both shoulders with point tenderness over the posterior joint. Strength was measured to be 3/5 in both hands; 2/5 in both wrists; 2/5 in both shoulders; and 5/5 in both lower extremities. Dr. Chengappa diagnosed plaintiff with bilateral shoulder bursitis. Plaintiff again refused cortisone injections. Plaintiff was instructed to continue with Naproxen. Plaintiff was also diagnosed with bilateral hand/wrist arthralgia and a cervical MRI was ordered to check for radiculopathy or myelopathy. Plaintiff was also diagnosed with microcytic anemia. (Tr. 179.) Upon review of Dr. Chengappa's examination, Dr. Porter noted that plaintiff's nerve conduction studies were normal. Dr. Porter continued to question the etiology of plaintiff's bilateral arm pain and weakness. (Tr. 180.)

Plaintiff returned to St. Louis University's Department of Surgery on March 20, 2003, and was examined by Dr. Kerri M. Woodberry. Plaintiff continued to complain of pain which Dr. Woodberry noted to be non-anatomic and not localized. Plaintiff reported diffuse pain over the dorsal forearms bilaterally, now in the upper arms. Plaintiff reported that she had been wearing her

splints and limited her activity, but that she had no improvement in the pain. Plaintiff rated her pain at a level 6 on a scale of 1 to 10. Physical examination showed plaintiff to be tender to palpation throughout the dorsal forearms. Plaintiff had pain with resisted flexion and extension, and tenderness over the upper arms. Dr. Woodberry noted there to be no evidence of significant edema although plaintiff complained of repeated swelling of the arms. Plaintiff's grip strength was measured to be 10 on the left and 5 on the right. Pinch strength was measured to be 5 bilaterally. Dr. Woodberry concluded plaintiff to have bilateral hand and arm pain of unclear etiology. It was noted that plaintiff had no classic symptoms of carpal tunnel or cubital tunnel. Dr. Woodberry noted plaintiff to have some localized tenderness over the radial tunnel, but that her exam was non-anatomic. Plaintiff denied any neck pain. Dr. Woodberry noted plaintiff to be scheduled for an MRI. Dr. Woodberry opined that plaintiff may have fibromyalgia, but deferred this diagnosis to the rheumatologist or to Dr. Porter. Dr. Woodberry instructed plaintiff to return for follow up one month after seeing Dr. Porter. (Tr. 182.)

On April 25, 2003, plaintiff failed to appear for a scheduled appointment with the Division of Rheumatology. On April 26, 2003, plaintiff cancelled a scheduled appointment with SLUCare's Division of General Internal Medicine. (Tr. 183.)

Plaintiff returned to Dr. Chengappa at SLUCare on June 10, 2003, and complained of having experienced pain in her neck since May 2003 due to lifting heavy objects. Plaintiff reported continued arm pain. Dr. Chengappa noted that Dr. Woodberry had instructed plaintiff to stop using the arm braces. Plaintiff reported that physical therapy for shoulder bursitis provided no relief. Plaintiff further reported that Naproxen and Vioxx did not help her condition. Dr. Chengappa noted that the MRI showed plaintiff's neck and spine to be "fine." Physical examination showed tenderness along the trapezius with palpation and tenderness over the C6 level of the spine without radiation. Strength of the hands and forearms was measured to be 4/5 bilaterally. (Tr. 183.) Dr. Chengappa diagnosed plaintiff with bilateral arm pain and neck pain, most likely musculoskeletal in origin. Plaintiff was instructed to discontinue Naproxen, and Mobic[5] was prescribed. Plaintiff was given instructions for neck exercises and was instructed to return for follow up in two months. Plaintiff requested that she be referred to Neurology. (Tr. 184.)

Plaintiff returned to Dr. Chengappa on August 19, 2003, and complained of an increased burning sensation in both hands with swelling. Plaintiff reported having continued shoulder pain and that she cannot lift anything heavy due to such pain. Plaintiff reported that Mobic did not help, and plaintiff was instructed to

---

[5]Mobic is indicated for relief of the signs and symptoms of osteoarthritis. Physicians' Desk Reference 981 (55th ed. 2001).

start Naproxen again.  Tenderness over the C6-C7 level of the spine was noted with palpation as well as tenderness over the shoulders. Pinprick sensation was noted to be positive bilaterally. Plaintiff's grip strength was measured to be 3/5; tricep and bicep strength was measured to be 3/5; and adduction and abduction of the shoulders was measured to be 3-/5.  (Tr. 186.)  Plaintiff was diagnosed with neuropathic pain, for which Neurontin[6] was prescribed and plaintiff was instructed to continue with Naproxen. Plaintiff was also diagnosed with shoulder bursitis, for which she was referred to an orthopedist for possible steroid injection. (Tr. 187, 188.)

Plaintiff visited St. Louis University's Division of Neurology on September 9, 2003.  Plaintiff's relevant medical history was noted.  Plaintiff reported that she cannot carry heavy items such as a laundry basket and that she drops things with both hands.  Dr. J. Schaben noted plaintiff to be taking Naproxen.  It was noted that plaintiff discontinued Neurontin because it caused nausea, vomiting and dizziness.  (Tr. 190.)  Physical examination showed plaintiff to experience pain about both shoulders.  (Tr. 192.)  Muscle strength was measured to be 4+/5 in the deltoids and in the biceps and triceps.  The remainder of the examination showed

---

[6]Neurontin is used to manage a condition called *postherpetic neuralgia*, i.e., pain after "shingles."  <u>Medline Plus</u> (revised Oct. 3, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202732.html>.

muscle strength to be 5/5. Dr. Schaben noted plaintiff to have very mild decreased pinprick sensation over the medial aspect of the hands bilaterally. Phalen's test was mildly positive. Tinnels test was negative. (Tr. 193.) Dr. Schaben noted plaintiff's nerve conduction study performed in December 2002 to have been read as normal. Dr. Schaben also noted an examination in April 2003 to show spinal C5-6 postero-central disc bulge. Dr. Schaben opined that plaintiff had bilateral carpal tunnel syndrome and noted that he could not completely rule out radiculopathy. Dr. Schaben ordered an EMG and nerve conduction study for carpal tunnel syndrome/radiculopathy. Plaintiff was instructed to wear wrist splints. Plaintiff was also instructed to follow up with Dr. Xu once the tests were completed. (Tr. 194.)

Neurologist Dr. Ling Xu also examined plaintiff on September 9, 2003. Dr. Xu noted plaintiff to have had bilateral hand pain for five years, with such pain greater on the right than the left. It was noted that treatment with Naproxen had been unsuccessful. Dr. Xu noted plaintiff's laboratory tests and nerve conduction study completed in December 2002 to be within normal limits. Dr. Xu also noted MRI's of the shoulder and cervical spine to be normal, as well as x-rays of the wrists. Physical examination showed muscle tenderness in both upper extremities. Plaintiff had normal power without atrophy. Dr. Xu noted there to be decreased sensation over the first-through-fourth fingers in

both hands. Deep tendon reflexes were noted to be normal. Dr. Xu diagnosed plaintiff with bilateral carpel tunnel syndrome, symptomatic. Dr. Xu ordered an additional nerve conduction study to confirm the diagnosis and instructed plaintiff to wear splints all day and all night. Dr. Xu opined that if the nerve conduction study yielded positive results and if plaintiff continued to obtain no relief, surgery may be considered. (Tr. 195.)

On October 6, 2003, plaintiff underwent the nerve conduction study but refused the EMG testing. The results of the study were mildly abnormal consistent with mild ulnar sensory neuropathy. It was noted that the finding was nonspecific and may indicate early ulnar nerve entrapment across the elbow, but the exact site of the entrapment could not be determined since the ulnar motor study was normal. There was no evidence of carpal tunnel syndrome. It was also noted that there appeared to be no evidence of radiculopathy, but that the test was incomplete so it could not be determined. (Tr. 197.)

Plaintiff visited Dr. Xu on October 7, 2003, for follow up of her limb pain. Plaintiff complained of edema but reported that she experienced no weakness or numbness. Physical examination showed decreased pinprick sensation across her first three fingers bilaterally. Plaintiff had normal deep tendon reflexes and motor strength. Muscle tenderness was noted upon palpation of both upper extremities at trigger points. Dr. Xu diagnosed plaintiff with

possible reflex sympathetic dystrophy[7] (RSD) and possible fibromyalgia for which Amitriptyline[8] was prescribed as well as physical therapy. Dr. Xu also diagnosed plaintiff with clinical symptomatic carpal tunnel syndrome and referred plaintiff for physical therapy and splints. Plaintiff was instructed to return in two months for follow up. (Tr. 198, 199.)

Plaintiff returned to Dr. Chengappa at SLUCare on October 21, 2003. Plaintiff reported continued pain in her arms and hands. It was noted that plaintiff had not yet started physical therapy. Plaintiff reported that Amitriptyline caused her to feel drowsy. Plaintiff continued to take Naproxen. Dr. Chengappa noted plaintiff's anemia to be stable. Dr. Chengappa instructed plaintiff to continue with her medications and to follow up with Dr. Burge and Dr. Xu as scheduled. (Tr. 200.)

Plaintiff returned to Dr. Xu on December 2, 2003. Plaintiff reported no side effects from her medication. Physical examination showed tenderness to plaintiff's arm. Dr. Xu instructed plaintiff to increase her dosage of Amitriptyline and to

---

[7]Reflex sympathetic dystrophy is "a painful disorder that usually follows a localized injury, that is marked by burning pain, swelling, and motor and sensory disturbances especially of an extremity, and that is associated with sympathetic nervous system dysfunction." Medline Plus, *Merriam-Webster Medical Dictionary* (2005)<http://www2.merriam-webster.com/cgi-bin/mwmednlm>.

[8]Amitriptyline is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat chronic pain or certain skin disorders, Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

continue with physical therapy.  Plaintiff was instructed to return in six months for follow up.  (Tr. 205.)

On January 27, 2004, plaintiff visited Dr. Porter and Dr. Chengappa and complained of continued arm and hand pain without change despite medication.  Plaintiff reported continued swelling in her hands.  Plaintiff also reported a recent onset of left shoulder pain due to lifting groceries, but that the pain had mostly resolved after two weeks.  Plaintiff reported that she stopped participating in physical therapy after Christmas because she had flu-like symptoms.  Dr. Porter noted plaintiff to have full range of motion, and plaintiff's muscle strength was measured to be 5/5.  Dr. Porter noted plaintiff to experience pain on elicitation of reflexes in her upper extremities similar to her pain.  Pain was noted upon palpation to the left shoulder, arms and hands. Plaintiff was diagnosed with hypertension, chronic pain, and left shoulder pain.  HCTZ was prescribed for hypertension.  Plaintiff was instructed to continue with her other medications and to continue to follow up with Neurology.  (Tr. 206-09.)

In a memorandum dated December 3, 2004, Dr. Steven Brenner from the Department of Neurology at SLUCare wrote:  "With reference to Lela [sic] Jones.  Has severe pain in hands due to complex regional pain syndrome and limited on activity.  Not able to work due to pain, weakness in hands."  (Tr. 224.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the non-disability requirements for a period of disability and disability benefits under the Social Security Act and was insured for benefits through the date of the decision. The ALJ also found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found plaintiff's bilateral shoulder bursitis and history of right wrist and forearm tendinitis to be severe, but that such impairments did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found plaintiff's allegations regarding her limitations not to be totally credible. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform work-related activities except for lifting or carrying more than twenty pounds occasionally and ten pounds frequently. The ALJ found plaintiff's RFC not to preclude plaintiff's past relevant work as a house-keeper. The ALJ therefore determined plaintiff's medically determinable conditions not to prevent plaintiff from performing past relevant work, and thus that plaintiff was not under a disability at any time through the date of the decision. (Tr. 20-21.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security

Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's

impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

<blockquote>
3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.
</blockquote>

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in his determination that plaintiff had the RFC to perform light work. Plaintiff also claims that the ALJ erred in

finding plaintiff not to be credible. Finally, plaintiff contends that the ALJ erred in his determination that plaintiff could return to her past relevant work.

A.    Credibility Determination

Plaintiff claims that the ALJ erred in finding her subjective complaints of disabling symptoms not to be credible.

In determining a claimant's subjective complaints of pain, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to:  1) the claimant's daily activities; 2) the duration, frequency and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness and side effects of medication; and 5) claimant's functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. An ALJ must do more than merely invoke Polaski to insure "safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits plaintiff's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The

determination of plaintiff's credibility is for the Commissioner, and not the Court, to make. <u>Pearsall</u>, 274 F.3d at 1218 (citing <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987)).

In this cause, the ALJ identified the <u>Polaski</u> factors and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted that no treating physician ever placed any specific long term work-related restrictions upon plaintiff's activities since February 28, 2001. <u>See</u> <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions). The ALJ also noted that plaintiff's collection of unemployment benefits subsequent to her alleged onset date of disability diminished her credibility. <u>See</u> <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement required for unemployment benefits that claimant is capable of working and seeking work is "clearly inconsistent" with claim of disability during same period). The ALJ noted that plaintiff's credibility was likewise diminished by her failure to comply with recommended treatment, including physical therapy, pain injections, and EMG testing; as well as the lack of strong prescription pain medication for plaintiff's complaints of disabling pain. <u>See</u> <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991) (ALJ may properly consider the claimant's willingness to submit to treatment

and the type of medication prescribed to determine the sincerity of the claimant's allegations of pain). Finally, the ALJ noted that multiple physical examinations showed plaintiff to have full muscle strength in the upper extremities, with no muscle atrophy or significant range of motion deficits. See Harris, 45 F.3d at 1193 (objective medical evidence is one factor to consider in determining a claimant's credibility). These findings are supported by substantial evidence on the record as a whole.

The undersigned notes that the ALJ found plaintiff's daily activities of driving a car, caring for minor children, occasional shopping, and light housework to likewise diminish her credibility. A claimant's ability to engage in such limited activities, however, is not inconsistent with complaints of pain and is insufficient in and of itself to support a finding that a claimant can engage in light work. Draper v. Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005). Nevertheless, in light of the numerous other inconsistencies appropriately found by the ALJ and supported by the record, as set out above, it cannot be said that the ALJ's ultimate credibility determination is not supported by substantial evidence on the record as a whole. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (ALJ's arguable deficiency in opinion-writing technique does not require a credibility finding to be set aside where it otherwise is supported by substantial evidence).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

B.    Residual Functional Capacity

Plaintiff claims that the ALJ erred in his determination that she had the RFC to perform light work inasmuch as there exists no medical evidence to support the finding that plaintiff retained the lifting capacity as found by the ALJ, and because substantial evidence fails to support the ALJ's finding that plaintiff had no manipulative limitations.

Residual functional capacity is what a claimant can do despite her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description

of her symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.  An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect her current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment.  See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

In this cause, the ALJ relied on the Physical RFC Assessment completed by Counselor Hickerson in December 2002 to find plaintiff able to lift and carry ten to twenty pounds.  The ALJ determined that this finding was not inconsistent with the opinions of Dr. George, plaintiff's treating physician, and Dr.

Sudekum, who both found plaintiff able to return to work without functional restrictions. (Tr. 18.) For the following reasons, the ALJ's determination is not supported by substantial evidence.

An ALJ must determine a claimant's RFC as it exists at time of the administrative hearing. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995). The hearing in this cause took place in April 2004. The RFC Assessment upon which the ALJ relied was completed by Counselor Hickerson in December 2002 and was based on information obtained from Drs. George and Sudekum for periods ending February and April 2001, respectively – three years prior to the hearing and six to eight months prior to plaintiff's alleged onset of disability. Significantly, there existed substantial evidence in the record subsequent to December 2002 which detailed plaintiff's continued treatment for and exacerbation of symptoms; physical findings of decreased strength and motion; and indeed, subsequent diagnoses of possible reflex sympathetic dystrophy, possible fibromyalgia and clinical symptomatic carpal tunnel syndrome. As such, in making the RFC Assessment in December 2002, Counselor Hickerson did not have before her all records of plaintiff's condition as it existed at the time of the hearing. <u>See</u> <u>Lauer</u>, 245 F.3d at 705. It cannot be said, therefore, that the ALJ's determination to rely on this RFC Assessment constitutes substantial evidence on the record as a whole when the Assessment itself is based on an incomplete record of plaintiff's impairments,

symptoms and treatment. See, e.g., Jenkins v. Apfel, 196 F.3d 992 (8th Cir. 1999) (opinion rendered by non-examining, reviewing physician cannot constitute substantial evidence in light of conflicting assessment by treating physician based on treatment rendered subsequent to opinion).

Further, the undersigned notes that while the ALJ summarized the post-December 2002 evidence in his historical account of plaintiff's treatment history, he otherwise engaged in no discussion or analysis indicating to what extent, if any, this evidence was considered in making the disability determination. Instead, the ALJ determined only to accord great weight to the opinions of Drs. George and Sudekum rendered in 2001, found them to be consistent with the RFC Assessment completed in December 2002, and determined thereon that plaintiff was able to perform light work. The ALJ's reliance on dated reports and failure to credit subsequent supporting evidence, including treatment notes of plaintiff's treating physicians that indicate continued, or, as in this case, exacerbated symptoms consistent with subjective complaints, is error and does not constitute substantial evidence upon which to find non-disability. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Morse v. Shalala, 32 F.3d 1228, 1230-31 (8th Cir. 1994).

Other than the December 2002 RFC Assessment, there is no evidence in the record, medical or otherwise, to support the ALJ's

finding that at the time of the administrative hearing, plaintiff retained the ability to lift and carry ten to twenty pounds or that plaintiff experienced no manipulative limitations. "[I]t is incumbent upon the [Commissioner] to 'establish by medical evidence that the claimant has the requisite RFC'" to perform work. Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). "'[I]f a treating physician . . . has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated . . . to address a precise inquiry to the physician so as to clarify the record.'" Id. (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir. 1983)). An absence of opinion does not constitute medical evidence upon which an ALJ may base his RFC assessment. See Lauer, 245 F.3d at 705.

In the absence of medical evidence demonstrating the extent to which plaintiff may be limited in her ability to perform specific exertional work activities, the ALJ had a duty to fully and fairly develop the record by seeking an opinion from plaintiff's treating physicians as to how plaintiff's impairments affect her ability to perform such specific functions in the workplace. See Nevland, 204 F.3d at 858; see also Lauer, 245 F.3d at 705-06. Despite the numerous treatment notes of Drs. Porter, Chengappa and Xu, no inquiries were made of these treating physicians as to plaintiff's ability to function in the workplace.

Accordingly, the ALJ's determination that plaintiff retained the RFC to engage in the lifting and manipulative requirements of light work is not supported by substantial evidence on the record as a whole. This cause should therefore be remanded to the Commissioner for a proper assessment of plaintiff's functional limitations resulting from her impairments, including obtaining information from plaintiff's treating physicians as to what level of work, if any, plaintiff is able to perform. <u>Dixon v. Barnhart</u>, 324 F.3d 997, 1003 (8th Cir. 2003); <u>Nevland</u>, 204 F.3d at 858; <u>Vaughn</u>, 741 F.2d at 179.

C.   <u>Past Relevant Work</u>

Plaintiff complains that the ALJ failed to make explicit findings as to the physical and mental demands of her past relevant work as a housekeeper, and thus erred in finding plaintiff able to perform such work.

At step four of the evaluation process, the ALJ must determine whether the claimant can perform her past relevant work. In making this determination, the ALJ must make explicit findings regarding the actual physical and mental demands of such past work. <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999). "The ALJ may discharge this duty by referring to the specific job descriptions in the *Dictionary of Occupational Titles* [DOT] that are associated with the claimant's past work." <u>Id.</u>   In this cause, the ALJ referred to the specific job description of "cleaner, housekeeper"

as set out in DOT Job Number 323.687-014 and found that plaintiff could perform her past relevant work as a housekeeper or housekeeping supervisor. (Tr. 20.) Because the ALJ relied on a specific listing in the DOT, namely Job Number 323.687-014, for the requirements of a cleaner and housekeeper as the job is performed in the national economy, the ALJ committed no error in his use of the DOT. <u>Brinegar v. Barnhart</u>, 358 F. Supp. 2d 847, 858 (E.D. Mo. 2005).

As set out above, however, the ALJ's determination of plaintiff's RFC was not supported by substantial evidence on the record as a whole. <u>See</u> discussion <u>supra</u> at Section V.B. Therefore, it cannot be said that substantial evidence supports the ALJ's conclusion that plaintiff retained the RFC to return to her past relevant work. <u>Pfitzner</u>, 169 F.3d at 568-69.

Therefore, the undersigned determines the Commissioner's decision not to be based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration. Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for this Court to award plaintiff such benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the cause shall be remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE


Dated this _27th_ day of September, 2006.